## THE SEA GULL.

A steamer held to be exclusively responsible for a collision with a sailing-vessel; the collision having occurred on a night when the stars were plainly visible, and when, though a little haze was on the water, the night was to be called clear; there having apparently been some want of vigilance in the lookout of the steamer, who did not discern the sailing-vessel until the steamer was close upon her, at which time orders, which, as the result proved, tended to bring on a collision, were given on board the steamer.

CROSS-APPEAL from the decree of the Circuit Court for the District of Maryland, dividing equally the damages arising from a collision at sea, between the schooner Sarah and the steamer Sea Gull, on the theory that each was equally in fault.

The case was thus:

A statute of the United States—the act of 29th April, 1864—thus enacts:

"ARTICLE 16. Every steamship, in approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.*

" ARTICLE 15. If two ships, one of which is a sailing-ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing-ship."

These provisions did but embody in a statutory form, what was previously the well-settled law of the sea.†

On the evening of January 21st, 1871, the steamer Sea Gull was sailing in the open sea from the north, between Baltimore and Charleston, for the south, in a course south by west half-west, and the schooner Sarah between the same

---

* 13 Stat. at Large, 61.

† St. John v. Paine, 10 Howard, 558; The Genesee Chief, 12 Id. 460, cases decided by the Supreme Court in 1850 and 1852; New York and Virginia Steamship Co. v Calderwood, 19 Id. 245, decided in 1856; The Steamer Oregon et al. v. Rocca, 18 Id. 570; and Haney v. Baltimore Steam Packet Co., 23 Id. 291, decided in 1859; The Carroll, 8 Wallace, 302.

ports, from the south for the north in a course northeast by east. The vessels were thus approaching on converging lines. The steamer's speed was about eight miles an hour, the schooner's seven, and the nearest land was thirty miles distant. There was a fresh breeze, west-southwest. Stars were visible overhead, and though it was somewhat hazy on the water the night was fairly to be called a clear one.

Both vessels had proper lights brightly burning in their proper places. The schooner had one lookout properly placed, and the steamer had one lookout also; the steamer's lookout being on the forecastle, and, as was testified, within a few feet of the stem. At about nine o'clock in the evening the lookout on the schooner descried and reported a light ahead. The light proved to be the foremast-headlight of a steamer, about four miles distant, and one point on the port bow of the schooner. The red or portlight of the steamer, which was still on the schooner's port bow, soon now became visible. The schooner, according to the positive testimony of three witnesses on her, including the pilot and the captain, who was at his side giving orders—the captain giving repeated orders to this effect, and calling the helmsman's attention to a star by which he could steer if he could not by the compass—*continued her course,* when, according to the testimony of these same witnesses, the steamer not having previously changed her course at all, and the vessels being close by one another, the green or starboard light of the steamer came suddenly into view; showing, of course, that the helm of the steamer had been starboarded. The captain and master testified that not knowing on which side of her the steamer would attempt to pass, and deeming it prudent and their duty under the circumstances still to keep their course, so as not to baffle those in charge of the steamer in any effort which they might make, even at the last moment, to pass on either side, still kept the schooner steadily on her course, but that the steamer continued, with undiminished speed, to approach. The result was a collision in which the steamer ran so violently into the schooner as

to cut three or four feet into her, and sink her almost imme-
diately; those on board barely escaping with their lives.

The only oral or written evidence from witnesses on the
schooner tending to show any other proceedings than these,
was that of the captain himself, who testified that when the
steamer was about to strike the schooner, and only forty or
fifty yards off, he shouted out, "Let go her gaff-topsail, and
lower her peak;" but that the order was not examined, the
collision having occurred immediately after it was given,
and before time had elapsed to execute it.

However, three witnesses from the steamer—the captain,
the second mate, and the helmsman—all swore that when
the collision took place, the course of the schooner was
southeast; a course which would have been produced by
the execution of the captain's order to change the schooner's
sails, and that as they saw her sails after the schooner was
struck her sails were on the port side.

As respected what was done on board the steamer, it
seemed from the testimony of witnesses from her that the
schooner was not seen until about a quarter of an hour after
the schooner had seen the steamer; that her sails were then
seen by the lookout, though they could not be well distin-
guished from each other; that the captain, whose watch it
was, was in his room, asleep; that the second mate belonged
to the captain's watch, and was accustomed to be on deck
only during the captain's command, when his own position
was subordinate; and that on this occasion he had taken
charge of the captain's watch; that the second mate saw the
vessel on the starboard bow, about the same time the look-
out did, and *at once* gave the order "hard a starboard," to
the man at the wheel, helping him to heave it hard a star-
board himself; that when the order to heave hard a starboard
was given, no lights, either red or green, were seen, and
that the schooner was then supposed to be half a mile off,
if not more; that the steamer answering the wheel, her head
fell off to port, three or four points, and the second mate
then saw the schooner's red light plainly, and saw that she
had ported her helm and changed her course, about half a

point to the east, which brought her across the steamer's bow; that the moment this was seen, the wheel was put hard a port; that on the same moment the bell was rung, the engine was stopped, and the captain was in the act of ringing the bell to back the ship when the collision took place; a collision so seriously injuring the steamer that water came into her by the barrelful, and that it was only by incessant working of the steam pumps that the vessel was able to make port (which she sought at once to do), at all. How exactly the schooner was struck, and where, was a matter about which the testimony was not harmonious.

One witness (the second mate of the steamer) testified that the steamer struck the schooner on her port side, just forward of the main-chain, nearly at right angles, with a slight slant towards the bow of the schooner.

Other witnesses testified that the steamer struck with a slight slant towards the stern of the schooner.

It was more plainly proved that the steamer received her injury on the port side of her stem.

The District Court held both vessels liable.

In regard to the steamer, the court said that before the officer in command changed its course, he should have waited to see the lights of the schooner, and as the vessels were approaching at the rate of fifteen miles an hour, have stopped the steamer's engine; that starboarding was a false movement; one not corrected but made worse by the subsequent porting.

In regard to the schooner, while the court confessed to a good deal of difficulty, in view of the conflict of evidence, and in a certain want of particularity in it, as to exact times when things were stated to have been seen, in saying that the schooner too was to blame, yet relying upon the evidence of the three persons on the steamer, that when the collision took place the course of the schooner was southeast and her sails on the port side, and on the further testimony of the second mate of the steamer, that she struck the schooner on her port side just forward of the main chain nearly at right angles, with a slight slant towards the bow

of the vessel, the court thought that the course of the schooner must have been changed before the collision. The court, therefore, held both vessels equally in fault, and made each equally responsible for the damages; expressing a hope, however, that the case might be reviewed by another tribunal.

The Circuit Court, on appeal, affirmed the decree of the District Court, and from the decree of affirmance the case was now here on appeals by both vessels.

*Messrs. S. T. Wallis and J. H. Thomas, for the owners of the schooner:*

1. The steamer was exclusively in fault. She had but one lookout. She was an ocean steamer and, as such, should have had two; and they ought to have been on the very bow of the boat, on the lower deck, looking ahead.*

It was the captain's watch. He should have been on deck.† He was asleep in his cabin. The second mate was on his watch, and took charge of it. The result shows that the mate was incompetent for the duty which, owing to the captain's neglect, was put upon him.

With inattentive and incompetent officers thus proved to have been in charge of the steamer, every presumption, in matters where the testimony conflicts or is obscure, is against her; and with this as a thing not to be denied the whole case is to be considered.

The steamer took no measures to discover the course of the schooner when she was seen, but *immediately* starboarded and a moment after ported her wheel. She did not stop her engines till the moment of collision.

2. The schooner was not in fault. Both of her lights were burning brightly. She saw the steamer's headlight five miles off. Gave immediate orders to the helmsman, and several times repeated them, to keep her steadily on her course. She did not change her course from the mo-

---

* Chamberlain v. Ward, 21 Howard, 571.
† Haney v. Baltimore Steam Packet Co., 23 Id. 292.

ment she saw the steamer up to the moment of collision. If the testimony leaves any room for doubt on this point, it shows, at all events, that she did not change until they were within thirty or forty feet of each other.   A change at such a moment could not have contributed to the collision.   If it did, she will not be held responsible for a mistake in a moment of well-founded alarm and danger, needlessly produced by the previous fault of the steamer.

The steamer alleges that the schooner changed her course. This court has heretofore said:

" This is the stereotyped excuse usually resorted to for the purpose of justifying a careless collision.   It is always improbable, and generally false."*

An attempt was made to create the impression that some of the witnesses for the steamer saw the sails of the schooner on her port side before the collision.   But in the face of the evidence, that the schooner was kept on her course, the strong probability is that none of them saw the *direction* of her sails until *after* the collision.

Even if her foresail, the one nearest the steamer and that most likely to be seen by her, was momentarily on the port side, it might be true consistently with the theory and testimony of the schooner.   Going as they were, before the wind, the foresail would be occasionally becalmed by the mainsail. It was then liable to flap over to the port side.

The witnesses on the schooner swear positively that her course was not changed.   They speak from knowledge.   Any counter evidence from persons on the steamer is from inference only.†

The District Court would have adopted this reasoning, and have concluded that the schooner did *not* change her course, but for what it considered a controlling fact leading to a contrary conclusion.   He considered, of course, that if the schooner had *not* changed her course she would have

---

* Haney *v.* Baltimore Steam Packet Co., 23 Howard, 291.

† The Fannie, 11 Wallace, 240; New York and Liverpool Steamship Co. *v.* Rumball, 21 Howard, 382; The Genesee Chief, 12 Id. 461.

been struck a slanting blow on the port side, with a slight slant towards the stern. There are witnesses who prove that such was the exact blow given, and confessedly the steamer's bow was injured on its port side, not on its starboard; a fact which tends to show that the sort of blow which the District Court supposes was *not* given, was the very one that was.

The vast advantages which vessels navigated by steam have over sailing-vessels, is their capacity to turn suddenly, and most of all to stop at once; and this, with all their tremendous power, and the effect of a collision with them, has led courts to hold, almost as an irrebuttable presumption, that when, *on a clear night, in open sea*, a collision takes place between a steamer and a sailing-vessel the fault *must* be with the steamer; or at least to require very plain proof that it was not.

The courts do but give effect to that provision, alike of a positive statute and of the common law of the sea, that " if two ships, one of which is a sailing-ship, are proceeding in such directions as to involve risk of collision, the steamship *shall keep out of the way* of the sailing-ship."

In two cases where the sailing-vessels were held in any part responsible, the night was not clear and the schooners either had no light or insufficient ones.*

*Messrs. J. H. B. Latrobe and I. N. Steele, contra, for the steamer:*

That the steamer changed its course after sighting the schooner is admitted. The steamer's course down the coast having been southwest-half-west, adding three and a half points to port, and then deducting half a point to starboard, her course at the time of the collision would be south and by west half west.

And this we assume as the fact.

But did not the schooner change her course also? And here the usual contradictory testimony begins.

---

* The Potomac, 8 Wallace, 592; The Ariadne, 13 Id. 475, 476.

The schooner's witnesses, one and all, swear that up to the moment of collision the schooner's course was not changed; and, if they are to be believed, the schooner's course at the moment of collision was northeast by east.

The same witnesses swear, however, that the steamer struck the schooner at right angles and penetrated some three or four feet.

Now, they cannot be right on both points. Had the schooner held her course, northeast by east, that of the steamer being southwest by west-half-west, the steamer would have struck her at an angle of thirty-nine degrees, about; when a penetration of the schooner, such as all the witnesses on both sides agree took place, was physically impossible.

It follows as a matter of course then, as decided by the District and Circuit Courts, that the schooner changed its course.

This puts the case on two indisputable facts; first, the position of the steamer at the time of the collision; and second, the square blow received by the schooner.

Nor is this all. That the captain of the schooner intended to change his course is proved by the command he gave to lessen his aftersail preparatory to jibing, " Let go the gaff-topsail-sheet; slack the peak down."

Now, as these orders would not have been given had it not been intended to go to the eastward, and as the course of the vessel was to the southeast when struck, the inference is strong that the order must have been given in time for the change in position testified to by witnesses on the steamer.

It was partially on reasoning like the foregoing that the courts below came to the conclusion that the schooner changed her course. And inasmuch as this change of course seems to have proceeded from no apprehension on the part of the captain of the schooner—for he speaks of none—there was nothing to justify it. Had he kept his course there would have been no collision; or, at most, the comparatively harmless one attending a glancing blow at an angle of half a point.

Had there been no other testimony in the case but that which is here referred to, the decree would have been for the owners of the steamer.

There was other testimony, however; and this, in the court's opinion, involving the steamer, the loss was divided.

We contend, however, that the steamer was altogether blameless in the premises.

The gravamen of the charge against her is that the helm was put to starboard, and not to port, as it is contended it should have been when the schooner was seen approaching, and that subsequently it was ported.

But starboarding the helm when the schooner was seen over the steamer's starboard bow, was running away from the approaching vessel and consequently proper. To port the helm subsequently was equally proper, when it became apparent from seeing the red light that the approaching vessel had changed her course.

Much reliance is had by the other side on the fact that the captain was in the cabin when the collision became inevitable. If by any possibility the accident could have been attributable to his absence, no doubt the consequences should be visited upon the steamer. But if we show, as we do, that everything was done that was proper to be done in the case, irrespective of the captain, his absence becomes a matter of indifference.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Until within a recent period the sailing regulations founded in ancient usage, sometimes called sea laws, sanctioned by the decisions of the admiralty courts, furnished the principal rules of navigation in such emergencies, aided by the adjudications of the prize courts, whose practice conforms in some respects to the law of nations. Recently Congress has enacted regulations upon the subject, and those regulations are obligatory upon our commercial marine in all cases where they apply, but inasmuch as the act of

* The Fannie, 11 Wallace, 243.

Congress does not profess to regulate the whole subject of sailing-rules it cannot be understood as superseding the prior established usages of navigation which are not embraced in the sailing-rules contained in the Congressional enactment.

Signal lights of a prescribed character are required to be carried by steam-vessels when under way, and sailing-ships under way are required to carry similar lights, with the exception of the white masthead lights, which they shall never carry. Such a requirement, however, is of very little or no value unless the lights are properly displayed and kept burning brightly, nor is it then of any value as a precaution unless those in charge of the other vessel use the means to see the approaching lights before it is too late to adopt the proper measures to prevent a collision.

Lookouts are also required by the usages of navigation, but the object of the requirement will never be accomplished in case the lookout fails to perform the duty which the requirement contemplates. Nautical lookouts must be properly stationed, and should be vigilant in the performance of their duty, and if they are incompetent or inattentive, and the collision occurs in consequence of their neglect, the vessel to which the lookout is attached must be held responsible for the injury resulting to the other vessel.

Steamers approaching a sail-ship in such a direction as to involve risk of collision are required to keep out of the way of the sail-ship, but the sail-ship is required to keep her course unless the circumstances are such as to render a departure from the rule necessary in order to avoid immediate danger.

Vessels with sails being required to keep their course the duty of adopting the necessary measures of precaution to keep out of the way is devolved upon the steamer, subject only to the condition that the sail-ship shall keep her course and do no act to embarrass the steamer in her efforts to perform her duty. Doubtless the steamer may go to the right or left if she can keep out of the way, but if not, and the approach is such as to involve risk of collision, she is re-

quired to slacken her speed, or if necessary stop and reverse, and if she fails to perform her duty as required by the rules of navigation she is responsible for the consequences if the sail-ship is without fault, unless the steamer can show that the collision was the result of causes which could not be foreseen or prevented, or of inevitable accident.

In the case before us both vessels had proper signal lights and both had lookouts, but the better opinion is that the lookout of the steamer was not as vigilant as he should have been in the performance of his duty. Strong support to that view is derived from the fact that the lights of the steamer were seen by the lookout of the schooner when the vessels were three or four miles apart, but those in charge of the steamer saw nothing of the schooner until the two vessels were within a half-mile of each other, and then saw at first only the sails of the schooner and those indistinctly.

Where the emergency is great the order to the helmsman should undoubtedly be prompt, but under the circumstances of this case it was a rash act of the second mate to direct the man at the wheel to starboard the helm, as he did, before he had employed any available means to ascertain the course of the schooner. He admits that he had not seen the lights of the approaching vessel and the lookout admits the same thing. They both say that they saw the sails, but they admit that they could not distinguish one sail from another, and it may be that it was the shadow of the sails and not the sails themselves which was present to their sight at that moment.

Evidently the order was an injudicious one, which is sufficiently shown by the testimony of the officer who gave it, as he admits that in a short time he found it to be advisable to countermand the order and to direct the wheelsman to put the helm hard to port. Well-founded doubt cannot be entertained that if that order had been given in the first place the collision would never have taken place. Probably it was too late then, as the steamer had fallen off three or four points before the second order could be fully executed,

and it appears that the collision occurred before the steame could be brought back under the second order to the course she was pursuing antecedent to the first change made in her course.

These repugnant orders manifestly put the steamer upon a zigzag course, that is, first to the left and then to the right, and afford plenary proof that the officer in charge of the deck was in great doubt what to do, in which event it was his plain duty to slacken his speed, or, if necessary, as it plainly was, to stop and reverse, but he did nothing of the kind in season to render any such precaution effectual.

Undoubtedly it was the privilege of the steamer to go to the right or left if in so doing she could, with reasonable certainty, keep out of the way; but if not, it became her imperative duty to slacken her speed and, if necessary, to stop and reverse.

Corresponding conclusions were reached by the district judge, except that he did not find that the lookout of the steamer failed to see the lights of the approaching schooner as soon as he might have done if he had performed his duty. Much reason exists to conclude that the first error of the officer in charge of the deck was occasioned by that omission of the lookout, and that the excitement induced when he discovered that his first order was an improper one had more or less influence in promoting the subsequent errors. Subject to that qualification the views expressed by the district judge in respect to the conduct of the officer in charge of the deck of the steamer appear to be correct.

Cases arise unquestionably in which the want of a lookout, or his failure to perform his duty, will not be imputed to a vessel as a culpable fault, as where it appears that the other vessel was seen by the officer in charge of the deck in season to adopt every needful precaution, and that the want of a lookout or his failure to perform his duty as such did not and could not have contributed to the disaster, but it is very doubtful, in view of the circumstances, whether the case before the court falls within the first condition, and it is quite clear that the evidence will not support the conclusion that

the negligence of the lookout did not materially contribute to the subsequent mistakes and vacillating conduct of the officer in charge of the deck of the steamer.*

Approaching, as the two vessels were, on converging lines, it would clearly seem that the lookout of the steamer ought to have seen the schooner much earlier, as the evidence is full to the point that her signal lights were burning brightly, and if he had, it is not doubted that the collision would have been avoided, as the officer in charge of the deck of the steamer would, in all probability, have acted with more deliberation, in which event it may well be supposed he would not have given the direction that the course of the steamer should be changed before he had ascertained the course of the approaching vessel.

Considering the proximity of the vessels it may be admitted that prompt action was required, but it is plain that it was bad seamanship to change the course of the steamer before it had been ascertained whether the effect of the change directed would be to diminish or increase the danger to be apprehended from the impending peril. They, the two vessels, were still a half a mile apart, and time enough remained to adopt the proper precautions to prevent a collision, nor is it any valid excuse for the error committed to say that the officer in command of the deck was ignorant of the course of the schooner when he gave the order to starboard the helm, as in that event he should have waited a moment for that information, or, if the peril was impending and the danger too immediate to justify any delay on the occasion, then he should have slackened his speed, or, if necessary, stopped and reversed, as required by the sixteenth sailing-rule.

Beyond all doubt the order to starboard, under the circumstances, was an error, and the evidence warrants the inference that the officer who gave it came to the same conclusion as soon as he saw the red light of the schooner, which he admits he did see in a very short time after he gave the

---

* The Farragut, 10 Wallace, 337; The Dexter, *supra*, 69.

erroneous order.   Sufficient appears to satisfy the court
that the order to starboard was given without due reflection,
and that the attempt to correct the error by directing the
wheelsman to port the helm was not given in season to pre-
vent the disaster, as the steamer in the meantime had fallen
off more than three points.

By the sailing-rules the steamer was bound to keep out
of the way, and the whole evidence shows that she did not
comply with that requirement, and the rule of decision in
such case is that, *primâ facie*, the steamer is in fault; nor
does the case rest merely upon that presumption, for several
reasons: (1.) Because the evidence shows affirmatively that
the order to starboard given by the officer in charge of the
deck was an improper order.   (2.) Because the lookout of
the steamer was negligent in the performance of his duty.
(3.) Because the steamer did not slacken her speed nor stop
and reverse in season to accomplish the object contemplated
by the enactment containing that requirement.

II.  Attempt is made in argument to show that the schooner
also was in fault, and that the case falls within the rule which
requires that the damages shall be divided.

Support to that charge is attempted to be drawn from the
assumed fact that the schooner changed her course in viola-
tion of the rule of navigation which requires the sail-ship to
keep her course, as a correlative duty to that of the steamer
whenever the latter is required to keep out of the way.
Such undoubtedly is the general rule of navigation, but it is
subject to the qualification that it does not apply in such a
case when a departure from it is necessary to avoid imme-
diate danger.*

Two answers are made by the libellants to that defence,
either of which if found to be true is sufficient to exonerate
the schooner from the consequences of the accusation, if
proved to be well founded: (1.) That the evidence invoked
for the purpose does not establish the charge.   (2.) That the
schooner made no change in her course until the collision

---

* 13 Stat. at Large, 61.

was inevitable, nor until it became indispensably necessary in order to avoid immediate danger caused by the fault of the steamer.

1. All must admit that the burden to establish the charge is upon the claimants. They examined witnesses belonging to the steamer to support the theory of the defence, but the remark is applicable to them all that their cross-examination showed that they had no actual knowledge upon the subject, that they inferred that the charge was true from the fact that the two vessels collided, and from the manner in which they came together.

On the other hand all the persons on the deck of the schooner were examined by the libellants, and they testify, with one accord, that the schooner did not change her course as alleged by the claimants. Two of those, to wit, the wheelsman and the master who stood by his side, must know what did take place in that regard, and unless they have wilfully stated what they know to be false their statements must be correct; nor can it be denied that they state in the most positive terms that the charge is untrue. They were on the deck of the schooner and had the opportunity to know everything which occurred around them, nor can they well be mistaken in respect to the matter in question, but the witnesses on the steamer only infer what transpired on the deck of the schooner, and of course their statements are in the nature of opinions, and are certainly entitled to much less credit than such as are founded in actual knowledge of what did take place.

Mere inference from the circumstances of the collision is not reliable, since it is fully proved that the steamer attempted in the first place to go to the left and then ported her helm and attempted to go to the right; nor is it correct to suppose that the angle of the steamer when she struck the port side of the schooner was towards the stem of the schooner, as the proof is quite satisfactory that it was towards the stern.

Some of the witnesses state that the steamer struck the schooner at right angles, but the better opinion is that it was

with a slight angle in the opposite direction from that found by the district judge, if his opinion is correctly exhibited in the record.  Strong confirmation of that view is derived from the conceded fact that it was the port side of the stem of the steamer that was injured by the concussion.  She cut three or four feet into the schooner just forward of her main rigging, and being herself injured on the port side of her stem the inference is a reasonable one that she was heading somewhat towards the stern of the schooner.

2.  Be that as it may, it still is insisted by the claimants that the schooner changed her course and violated the sailing-rule which forbids it, but the evidence is not sufficient to establish the charge nor to render it probable that anything of the kind occurred, unless perhaps at the moment before the collision, when the master, seeing that the peril was impending, took the wheel from the helmsman and gave the order·" let go her gaff-topsail sheet and lower the peak," but the order was not obeyed, as there was no time to execute it before the steamer struck the schooner.

Rules of navigation continue to be applicable as long as the means and opportunity remain to avoid the danger, but they do not apply to a vessel required to keep her course after the wrongful approach of the opposite vessel is so near that the collision is inevitable.  Steamers under the rule that they shall keep out of the way must of necessity determine for themselves and upon their own responsibility, independent of the sailing-vessel, whether it is safer to go to the right or left or to slacken their speed or stop and reverse, and in order that the steamer may not be deprived of the means of determining the matter wisely, and that she may not be defeated or baffled in the attempt to perform her duty in the emergency, it is required that the sailing-vessel shall keep her course and allow the steamer to pass either on the right or left, or to adopt such other measures of precaution as she may deem best suited to enable her to perform her duty and fulfil the requirement to keep out of the way.

These rules of navigation are of great importance, but

they do not apply to the vessel required to keep her course after the wrongful approach of the steamer is so near that the collision is inevitable, nor will an error committed by the sail-vessel under such circumstances of peril, if she is otherwise without fault, impair the right of the sail-vessel to recover for the injuries occasioned by the collision, for the plain reason that those who produced the peril and put the sail-vessel in that situation are chargeable with the error and must answer for the consequences.*

Subject to that exception the sail-vessel must keep her course, but the case before the court, if any change was made in the course of the schooner, falls within the exception, and it follows that the decree of the Circuit Court must be reversed, with costs, and the cause remanded with directions to enter a decree in favor of the libellants for the whole value of the schooner, her freight, and cargo.

DECREE REVERSED.

---

\* Steamship Co. v. Rumball, 21 Howard, 383.