HARBOR TOWING CORPORATION, owner of the BARGE SHAM-ROCK, Libelant,

v.

The TUG RELIANCE, her engines, etc., the TUG C. O. NICHOLS, her engines, etc., in rem, the Judkins Towing Corporation, the Motor Vessel Saarland, her engines, etc., and Hamburg-Amerika Linie, Respondents.

JUDKINS TOWING CORPORATION, owner of the Tug Reliance, Libelant,

v.

The M/V SAARLAND, her boats, etc., in rem, and Hamburg-Amerika Linie, owner of the M/V Saarland in personam, Respondents.

HAMBURG–AMERIKA LINIE, a corporation, owner of the M/V Saarland, Libelant,

v.

Wilton C. JUDKINS, Respondent.

Nos. 8013, 8038 and 8041.

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 4, 1963.

Hugh S. Meredith (Vandeventer, Black, Meredith & Martin), Norfolk, Va., for Harbor Towing Corp. and The Shamrock.

Robert M. Hughes, III (Seawell, McCoy, Winston & Dalton), Norfolk, Va., for Judkins Towing Corp.

Roy L. Sykes (Jett, Sykes & Coupland), Norfolk Va., for Wilton C. Judkins.

Edward R. Baird (Baird, Crenshaw & Ware), Norfolk, Va., for Hamburg-Amerika Linie and Saarland.

WALTER E. HOFFMAN, Chief Judge.

These actions, consolidated for trial, pertain to a collision in the James River off Newport News, Virginia, in the general vicinity of Pier 14 operated by the Chesapeake & Ohio Railway Company. The location of the impact and which vessel initially sounded her signal are in substantial dispute. The collision occurred at 3:21 or 3:22 P.M. on March 17, 1958, between the German Motor Vessel SAARLAND and the Barge SHAMROCK, the latter being under tow by the Tugs C. O. NICHOLS and RE-

LIANCE as a single flotilla. A second (or third) impact took place when the starboard bow of the SAARLAND and the starboard quarter of the RE-LIANCE came together. The weather was clear, the current was ebbing at approximately 2 knots, and there was a light breeze from the southwest at approximately 15 miles per hour.

The SHAMROCK, loaded with oil, was being towed to Richmond by the C. O. NICHOLS which was made up on the port quarter aft of the barge. Some minutes prior to the collision the RELI-ANCE joined the flotilla and was made up astern of the barge on the pushing gear. Thus, at the time of impact, the RELIANCE was in a rigid position with her helm secured amidships and a mate aboard. Captain Judkins assumed command of the flotilla aboard the C. O. NICHOLS and the mate aboard this tug thereafter stationed himself on the starboard quarter of the Barge SHAM-ROCK to serve as a lookout on that side as the barge houses partially obstructed the view of Captain Judkins from the wheelhouse of the C. O. NICHOLS when looking to starboard. A tankerman was also aboard the barge, but had no navigation duties and was painting until the moment of impact. Another seaman, Marshall, was in his bunk on the C. O. NICHOLS until the danger signal was sounded.

When the flotilla passed between channel buoys 7 and 8, at what may be described as the entrance of the James River, Judkins sighted sand tows ahead and also observed the SAARLAND headed down river in the direction of the Newport News channel.

In the James River off Newport News there are numerous piers and docks. While reference to the many charts and exhibits will more adequately describe the layout, an attempt will be made to picture the various courses in this opinion. Vessels entering Hampton Roads from the open sea pick up a compulsory pilot at the vicinity of Cape Henry which is the line between International Waters and Inland Waters. Conversely, vessels of certain sizes must take on compulsory pilots in leaving Norfolk, Newport News and other designated places until the ship reaches Cape Henry where the pilot is discharged. In entering the waters of Hampton Roads vessels are destined to go either to Norfolk via the Elizabeth River Channel, or to Newport News via the Newport News Channel and thence up the James River as far as Richmond. Thus, for water traffic of any appreciable size or draft, ships use the Newport News Channel and enter the James River between flashing buoys 7 and 8. The Newport News Channel runs approximately east and west. About 850 yards north of flashing buoy 8 is the entrance to the Newport News Creek which is generally known as the Small Boat Harbor, and which was the point of destination of the tug JESSIE LEWIS and two sand scows to be hereinafter mentioned. Continuing generally north northwest along the shoreline of Newport News we next find the Esso Pier about 350 yards from the western side of the Small Boat Harbor; then Pier 15 approximately 175 yards further along the shore; then Pier 14 approximately the same distance beyond Pier 15; next we reach Pier X, known as Battleship Pier where the hull of the KENTUCKY remained for many years and, measured from the outer end of Pier 14 to an extension of the outer end of Pier X, it would appear to be about 450 yards further upstream from Pier 14; approximately 800 yards beyond the measured extension of Pier X is Pier 9, known as the Ore Pier,[1] which extends an estimated 100 yards into the stream beyond the average pierhead line; Pier 8 is about 125 yards upstream of Pier 9; Pier 6 is estimated to be 250 yards upstream of Pier 8; Pier 5, from which the SAARLAND departed, is approximately 125 yards beyond Pier 6. Then follow Piers 4, 3, 2 and 1. Piers 1 through 9 are known as the C. & O. Railway piers. Piers 14 and 15 are known as the C. & O. coal piers. Con-

---

1. Pier 9, known as the Ore Pier, is not shown in the aerial photo admitted in evidence.

tinuing upstream along the Newport News shoreline are the piers of the Newport News Shipbuilding and Drydock Corporation. Some distance further to the north northwest vessels encounter the James River Bridge but only ships destined for the Hopewell and Richmond areas reach this point.

As other water traffic, not directly involved in the collision, had some effect upon the impact between the SAARLAND and the SHAMROCK flotilla, it is well to review the conditions which existed on the afternoon in question. The tug SOUMATCO, owned by Southern Materials Corporation, had five barges, each 120 feet in length, in tow when she crossed under the James River Bridge. The barges were laden with sand and gravel and were coupled at the ends with approximately 11 feet between each barge. The overall length of the SOUMATCO tow from the stem of the tug to the stern of the last barge was between 650 and 700 feet. Two barges were to be dropped off at Newport News and, by pre-arrangement, the tug JESSIE LEWIS, owned by Raymond Davis, proceeded from the Small Boat Harbor to a point approximately in the middle of the fairway off Pier 1. The SOUMATCO started breaking up her tow at this point but continued its southeasterly course down the James River, past Pier 5 where the SAARLAND was tied up, to a point off Pier 8 where the two tows were finally split. The SOUMATCO and her three barges continued downstream favoring the anchorage side of the fairway; the JESSIE LEWIS and her two barges headed downstream generally toward Pier 9 and on to the Small Boat Harbor, all of which brought the JESSIE LEWIS closer to the pierhead line.

The fairway off the described piers is admittedly "confined." From the offshore end of Pier 9 to the anchorage line is approximately 400 yards. The distance is about 450 yards off Pier 5. Proceeding further downstream the fairway widens to an estimated 900 yards off Pier X. It was slightly downstream from the offshore end of Pier X and the hull of the Battleship KENTUCKY that the collision took place approximately 550 to 600 feet off Pier X. The SAARLAND's compulsory pilot, Stallings, concedes that the narrow channel rule is applicable.[2] Reference to the words "fairway or mid-channel" pointedly suggest that Article 25 of the Inland Rules need not be restricted to waters which have been subjected to dredging operations. Indeed, the authorities are to the effect that Article 25 may be applied in rivers and bays where the area is confined and water traffic passes in substantially opposite directions. The Florence, 3 Cir., 186 F. 57; Commonwealth & Dominion Line, Ltd. v. Seaboard Transp. Co., D.C., 258 F. 707, modified D.C., 275 F. 617. While it may not have been practicable for the SAARLAND to adhere to the narrow channel rule when she initially backed out of Pier 5, it must be remembered that the vessel traversed a course in excess of three-quarters of a nautical mile before colliding with the SHAMROCK, and ample opportunity was afforded the SAARLAND to come within the rule had the vessel been prudently navigated.

The SAARLAND commenced her backing operation from Pier 5 at 3:07 P.M. With her stern swinging upstream the vessel had completed her turn and her docking pilot left at 3:12. At 3:13 her engines were placed at slow ahead— a speed stated to be 6 knots. Aided by the ebbing current the SAARLAND's speed through the water was between 7 and 8 knots.[3] She maintained this speed

2. Article 25 of the Inland Rules, 33 U.S.C.A. § 210, is as follows:
"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

3. Only the compulsory pilot, Stallings, refutes the contention that the current was ebbing. His testimony on this point is rejected in light of the abundance of evidence to the contrary.

until 3:20 (one minute prior to impact), when she put her engines in emergency reverse. Her engine room log indicates that the impact occurred at 3:21, but as this bump was probably when the SAARLAND struck the SHAMROCK's starboard quarter aft, it is likely that the glancing blow between the SHAMROCK's starboard bow corner and the SAARLAND's starboard quarter forward took place a few seconds prior thereto. Thereafter the tug RELIANCE, whose lines had been snapped by the force of the impact on the SHAMROCK's starboard quarter aft, was struck by the SAARLAND in the vicinity of the starboard quarter forward. The SAARLAND then proceeded astern of the flotilla and drifted, with her engines still in operation, near the center of the fairway after first veering to her starboard. She awaited the arrival of the Coast Guard and then departed for Morehead City, North Carolina.

It is significant to note the version of the collision as related by the German pilot of the SAARLAND, Captain Bendixen, on the day following the impact. According to a letter to his owners, the sea pilot took over the vessel at 3:15. At 3:18, Captain Bendixen stated, the following occurred:

> "Sighted on the starboard two sand-laden lighters which were under tow in same direction. Also at about one and one-half points to starboard ahead, the oil barge Shamrock was being pushed by the tugboats Reliance and C. O. Nichols and crossing the course of the Saarland at a narrow angle."

The testimony of Captain Bendixen lacks clarity and is fraught with conflicting views as to the SAARLAND's course changes, the SHAMROCK's course, the location of the sand barges, the signals given and received and many other details. Undeniably the sand tows had passed Pier 5 and were ahead of the SAARLAND at the time the latter vessel had dropped her docking pilot and headed downstream in the general direction of Pier 9. At one point Ben-

dixen states that he saw two sand barges down river ahead of the SAARLAND and about 200 yards to the starboard. Later he testified that the tows were approximately two points off the starboard and ahead approximately 500 yards. With the speed of the SAARLAND greater than the JESSIE LEWIS, it is likely that the SAARLAND and the sand barges were at a greater distance apart than at any other time when the SAARLAND steadied on her course downstream, and this is true even though it would take a few minutes for the vessel to reach her maximum speed at slow ahead. According to Bendixen, he did not see the SHAMROCK flotilla until the SAARLAND was off Pier 9 and, at that time, the SAARLAND changed her course to port. Bendixen fixes this course change at varying stages of his testimony as 3°, 2°, 3° or 4°, 5°. He later said that there was a second course change to port when the SAARLAND sounded two blasts for the approaching flotilla.

Stallings, the compulsory pilot, testified that the one course change was 6° to port. On the matter of signals, Bendixen, when called as an adverse witness, stated that the SAARLAND did not sound any whistle signal preparatory to overtaking the sand tows. When later called as a witness for the SAARLAND, he testified that he heard two blasts of her whistle for the sand tows, thus indicating that the SAARLAND intended to overtake the JESSIE LEWIS tow on the tow's port side. While Bendixen's letter, written on the day following the collision, places the SHAMROCK flotilla ahead "at about one and one-half points to starboard," his testimony at the trial reflects that the course of the oncoming SHAMROCK flotilla was not steady—that he observed the flotilla on his starboard bow, then on the port side, then back to starboard—that he at one time saw the flotilla on a crossing course and then observed it go back to a meeting situation.

The only other material witness testifying to the overtaking whistle signal

allegedly given to the JESSIE LEWIS and her tow was Stallings, the compulsory pilot. In answer to an inquiry on this point, he said:

"Well, when I was off Pier 9, I had sounded two blasts to what turned out to be the Jessie Lewis, but I received no reply, and since she was headed down approximately the same course that I was, I continued on."

Stallings, entirely familiar with the practice of breaking up tows in the James River, knew that the JESSIE LEWIS and her two barges were headed for the Small Boat Harbor; he also was aware of the fact that the JESSIE LEWIS would be angling across the fairway to come in close proximity to the piers for the purpose of entering the Small Boat Harbor. He contends, however, that the JESSIE LEWIS had not adopted this crossing pattern when he started overtaking the barges in tow. He explains his navigational efforts by saying that he assumed that the SAARLAND would pass the JESSIE LEWIS and then the JESSIE LEWIS would cross the channel astern of the SAARLAND. Stallings concedes that the JESSIE LEWIS was "in the way" and this prevented him from using a right rudder and, moreover, this was the only reason why he did not adhere to Article 25 of the Inland Rules. Assuming arguendo that the SHAMROCK flotilla was slightly off the SAARLAND's starboard bow, the pilot knew, in altering SAARLAND's course to port and attempting to overtake the JESSIE LEWIS and her two barges, that the SHAMROCK would have been required to proceed between the larger vessel and the JESSIE LEWIS tow, with the attendant danger of the JESSIE LEWIS crossing in front of the SHAMROCK. Stallings' interest in the safety of his ship obviously overshadowed his concern for the safety of both the approaching flotilla and the flotilla then being overtaken.

Manifestly the SAARLAND had not completed its overtaking procedure at the time of the collision. At the Coast Guard hearing Captain Stallings prepared a sketch which indicates that the SAARLAND was downstream of the JESSIE LEWIS at the time the approaching flotilla reached the point where the SAARLAND sounded her two blast signal. Although Stallings conceded at the trial that this exhibit was erroneous, if we assume that it was correct, the SAARLAND could have increased her speed and altered course about 15° to starboard, thereby avoiding the collision. However, the greater weight of the evidence is to the effect that the JESSIE LEWIS tug was ahead of the SAARLAND at the moment of impact as the tug had already passed the SHAMROCK flotilla. A more realistic approach indicates that the SAARLAND had overtaken the stern barge and was about to overtake the lead barge when the collision occurred. The JESSIE LEWIS tug passed the SHAMROCK at a distance of approximately 50 to 75 yards.

The preponderance of the evidence does not support the contention that any signal was given in attempting to pass the JESSIE LEWIS tow. The Court does find, however, that the SAARLAND blew a two blast whistle to the SHAMROCK, and that this was the first whistle blown by the approaching vessels. According to Stallings, the two blasts were given when the ship and flotilla were about 2000 feet apart, with the vessel in the vicinity of Pier X and the flotilla off Pier 15. According to Captain Bendixen the SAARLAND and SHAMROCK were were then about 1500 feet apart.[4] All agree that the C. O. NICHOLS immediately answered, within 15 to 20 seconds, with a one blast signal which had the effect of rejecting the suggested starboard-to-starboard passing as proposed by the SAARLAND and which indicated a port-to-port passing. Thereafter, with the flotilla showing her port side, she

4. Bendixen later said that the distance may have been only 1000 feet. This is difficult to believe as the SHAMROCK was lost under the bow of the SAARLAND when 1200 feet away.

**902**

disappeared from the view of those aboard the SAARLAND, with the SAARLAND sounding her danger signal and the C. O. NICHOLS doing likewise. In a last second effort to avoid the collision the engines on the C. O. NICHOLS were put in reverse and those on the RELIANCE were coming ahead at full speed but with a sudden hard left wheel, thus causing the flotilla to swing to her port and avoiding a head-on collision.

 The SAARLAND admits that it had no bow lookout stationed in the proper place and giving any advice to the bridge. The SAARLAND, approximately 500 feet in length, was equipped with a bridge 229 feet from the the stem of the vessel. The compulsory pilot, the master and others were on the bridge. The ship was not in trim fore and aft and she had a drag of 5 feet by the stern. Her forecastle, raised above the main deck, was even higher than usual and this made the view from the bridge more obscure. The SAARLAND attempts to exonerate herself because of the presence in the forecastle, standing by the anchor, of the third mate (Schmidt) and carpenter (Ortmann). Neither of these crew members was on the forecastle head. At best they were 11 to 15 feet from the bow. Like Stallings and Bendixen, they lost the flotilla when it went under the SAARLAND'S bow. They did not see the collision. No reports were ever given from the forecastle to the bridge through the loudspeaker available for that purpose. Plainly the failure to carry a lookout, at a time and place when one was needed, was a major contributing cause of the collision. The lookout, under such circumstances, is the "eyes of the ship" and should be as far forward as possible, The Manchioneal, 2 Cir., 243 F. 801, and should have no other duties, The Genesee Chief, 12 How. 443, 53 U.S. 443, 13 L.Ed. 1058. A vessel navigating in congested waters is under a prime duty to provide and maintain an effective lookout. The Sea Gull, 23 Wall. 165, 90 U.S. 165, 23 L.Ed. 90; The Madison, 2 Cir., 250 F. 850. This failure on the part of the SAARLAND could well be sufficient to

place this controversy under the major-minor fault rule were we to assume that the SHAMROCK flotilla was guilty of some fault, but we do not reach this point.

 We think it clear that the SAARLAND, by the admissions of her witnesses, violated other rules of navigation. For example, Article 18, Rule VIII of the Inland Rules, 33 U.S.C.A. § 203, provides:

"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals.

"The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

As heretofore noted, the preponderance of the credible evidence does not indicate that the SAARLAND sounded a two blast signal to the JESSIE LEWIS. Assuming, however, that such signal was given, it is admitted by all that no answering signal was given by the JESSIE LEWIS. It is the duty of the over-

taking vessel to await the assent from the overtaken vessel before carrying into effect its contemplated action. The George W. Elder, 9 Cir., 249 F. 956; The James L. Morgan, 2 Cir., 225 F. 34. The overtaking vessel bears certain risks in passing, one of which is the lead vessel changing course to avoid a third vessel,[5] and this is especially applicable where the pilot on the overtaking vessel is cognizant of the fact that the lead vessel must alter her course across the path of the overtaking vessel within a relatively short distance from where the lead vessel is being overtaken, and the lead vessel has given no assent to the passing. When Stallings brought the SAARLAND to a position approaching Pier 9, he was faced with several alternatives. He could, as he should have done with his knowledge of the courses to be followed by the JESSIE LEWIS and SOUMATCO, alter his course to starboard and then pass between the two tows but, as he indicated, this was not the most direct course to buoys 7 and 8 marking the entrance to the Newport News channel. He knew that it was his duty to keep his vessel under control and remain astern if necessary. When he finally concluded to alter his course to the left of the fairway, he then made his choice to pass the SHAMROCK flotilla starboard-to-starboard, without at that time having any assent from the JESSIE LEWIS flotilla that he was about to overtake, nor from the approaching SHAMROCK flotilla. Accepting, for argument purposes, his statement that he gave the starboard-to-starboard passing signal to the SHAMROCK when about 2000 feet away (a point that is certainly debatable because of the subsequent whistle signals and almost immediate impact), he placed the SHAMROCK in a position where it had no choice other than dissent and thereafter take emergency action. He also placed the SAARLAND where it could no longer maneuver in crowded waters reasonably close to the shoal.

Additionally, the SAARLAND's compulsory pilot admits that after the SAARLAND's course was altered, the SHAMROCK flotilla was *dead ahead*. It is of no significance that the SHAMROCK was on the SAARLAND's starboard bow prior to that time. No signal had been sounded for the approaching flotilla prior to the course change. Stallings concedes that it was a meeting situation when he first saw the SHAMROCK bearing about one point on the SAARLAND's starboard bow. It was assuredly no less a meeting situation after SAARLAND altered her course to port. Article 18, Rule I, of the Inland Rules, 33 U.S.C.A. § 203, provides that approaching vessels shall pass port-to-port when meeting "head and head, that is, end on, or nearly so." Stallings' election to sound a two blast signal when the flotilla was *dead ahead* was a clear violation of the rule as the vessels were then meeting "end on, or nearly end on." If the obviously intended courses of vessels will cause them to pass on nearly parallel lines, they are considered as "meeting" even though at times they may be headed across one another's bow. The Victory & The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The William Chisholm, 6 Cir., 153 F. 704. As Article 18, Rule I, requires a port-to-port passage under ordinary circumstances in a meeting situation, the burden of justifying a starboard-to-starboard passing rests upon the vessel initiating same. The Dauntless, 2 Cir., 3 F.2d 529. In the present case that burden has not been met. Furthermore, the vessel initiating the starboard-to-starboard passing assumes the risk of the inability of the vessels to pass in that manner. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218.

The fact that the courses of the approaching vessels may have been crossing does not, *per se*, create a *crossing situation*. If it was a crossing situation, the SHAMROCK would have been the

5. The Kirnwood, D.C., 201 F. 428, aff. 4 Cir., 211 F. 1020; The Hackensack, D. C., 32 F. 800; The Whiteash, D.C., 64 F. 893.

privileged vessel as it was on the SAARLAND's starboard hand. The courses of the approaching vessels—at least prior to SAARLAND's changing course to port —were undoubtedly crossing ahead. Captain Bendixen insists that the flotilla remained at a bearing of 5° on SAARLAND's starboard bow from the time the SHAMROCK was first sighted until she disappeared under the bow. If this be true, the two vessels were approaching each other with a constant bearing and a decreasing range—a clear warning of an impending collision. But, as heretofore indicated, the Court does not believe that the pattern of this collision reveals a crossing situation. Moreover, it is very difficult to believe from Bendixen's testimony that the bearing was at all times constant, aside from the fact that the bearing assuredly would increase as the vessels came closer. Bendixen first testified that the SAARLAND's only course change was off Pier 9; he later changed his testimony by saying that there was a second course change of about 5° to port when the two blast signal was given to the SHAMROCK—and that this second course change was made before any assenting signal was given— another clear violation of the rules if such occurred.[6]

█ In summary, it is obvious that the SAARLAND was solely at fault. There are, as is usual in collision cases, many inconsistencies in the testimony. Reviewing the record as a whole, and upon a complete analysis of the testimony and exhibits, the Court concludes that Harbor Towing Corporation and Judkins Towing Corporation are entitled to decrees in their favor against the M/V SAARLAND, *in rem*, and Hamburg-Amerika Linie, *in personam*, and that Judkins Towing Corporation, Wilton C. Judkins, and the tugs C. O. NICHOLS and RELIANCE are not responsible for the damages occasioned by the collision of March 17, 1958.

Present appropriate interlocutory decrees on notice.

---

6. The second course change is partially supported by the testimony of SAARLAND's second mate (Schwartz) who said that it was 15° to port.