## THE LUCILLE.

1. A schooner approaching a steamer coming towards her on a parallel line, with the difference of half a point in the course of the two, tending to a convergence, does right when she keeps on her course; and the steamer is bound to keep out of her way, and to allow her a free and unobstructed passage. Whatever is necessary for this it is the steamer's duty to do, and to avoid whatever obstructs or endangers the sailing vessel in her course.

2. Fault on the part of the sailing vessel at the moment preceding a collision (assuming fault to have existed) does not absolve a steamer, which has suffered herself and a sailing vessel to get in such dangerous proximity as to cause inevitable confusion, and collision as a consequence.

3. These doctrines—doctrines declared in *The Carroll* (8 Wallace, 302), and *The Fannie* (11 Id. 238)—redeclared and applied

4. A decree of a District Court where interest was not in terms given, affirmed in this court, April 28th, 1872, with interest at the rate allowed in the district where given, from its date, March 12th, 1869; the appeals being considered not well founded.

APPEAL from the decree of the Circuit Court for the District of Maryland, in a case of collision; the facts being thus:

A little after midnight of December 20th, 1868, the moon not shining, but the night not being a dark one, the schooner

Champion, sailing up Chesapeake Bay for Baltimore and keeping about five miles from the western shore of the bay, was seen at the distance of two miles on the *southeast* by the steamer Lucille going down the bay and out to sea. The wind was a very light breeze from the southeast; and the course of the schooner north-by-west, her sails well set on the *port* side. The course of the steamer was south-by-east-half-east, and her rate about seven or eight miles an hour. In a little while, there being no allegation of any natural cause for a catastrophe, nor allegation of want of proper lights, or that they were not seen, the steamer came stem on, upon the schooner, the steamer's port bow striking the schooner's starboard bow; the sails of the schooner *still upon the port side*, jibing over and injuring the steamer somewhat, but the schooner herself being " ripped right open, fore and aft," and going very soon to the bottom with her cargo and three of her crew; the captain climbing up on the steamer and escaping with his life.

Hereupon the owners of the schooner promptly, January 2d, 1869, libelled the steamer in the District Court for Maryland; alleging that the schooner had kept on her course in order that the steamer might pass to her starboard; that the steamer saw her in abundant time to get out of her way; that the steamer made no attempt in time to change her course; that when the schooner saw that there was danger of a collision it was too late for her to do anything effective to prevent it, and that the catastrophe was chargeable to the negligence and mismanagement of the steamer alone.

The answer of the steamer alleged that going on the courses that the vessels were going, " they would have passed each other at a considerable distance apart, but that without any danger prompting, and from pure negligence and want of care, the schooner, when she was nearly opposite the steamer, changed her course to the westward and came directly on the said steamer."

The steamer sought to support this view of the case by the testimony of one of her men, who swore that " when the schooner struck, she was heading across the bay, her head

toward the southwest;" and by the testimony of her captain, who swore that after the catastrophe, and after the master of the schooner had got on board of the Lucille, he said, in conversation, that " he had put his helm hard up," *i. e.*, had put it to the windward.*

The schooner, on the other hand, denied that she had changed her course, except in the moment of imminent peril and to escape certain destruction; and relied on the testimony of witnesses for the steamer who testified that they had noted the change, though they spoke of it as a change then accomplished—" when the steamer was within thirty yards of her"—" two minutes before the collision;" and relied also on the testimony of seamen from their own vessel that " the schooner could not have changed her course so far round as west, as her sails would have jibed and gone over to starboard," which it was testified positively they never did till the collision took place.

The schooner, which had been recently purchased by the libellants, was not a new vessel, but she had been lately put into good order by them, and with her cargo, oysters, was shown to have been worth $2800; and on the 12th of March, 1869, the District Court condemned the steamer in that sum. On the 12th of April following, her owners appealed to the Circuit Court, and on the 5th of January, 1871, the decree of the District Court was affirmed; the decree in neither court, however, providing in terms that it should bear interest. On the 14th of January, 1871, they appealed to this court, and the case was argued on the 10th of April, 1873.

*Mr. W. S. Waters, for the appellants, owners of the steamer:*

The master of the schooner, after coming on the steamer, admitted that he had " put his helm up." This put the vessel on a west or southwest course; and that the vessel was actually going on this course is proved by a witness from the steamer, who swears " that when the schooner

---

* The effect of this, of course, as the wind was from the southeast, would have been to bring the schooner in contact with the steamer.

struck us she was heading across the bay, her head towards the southwest." The schooner, therefore, instead of keeping on her course, as she ought to have done, changed her course; and by so doing produced the catastrophe.

*Messrs. W. S. Bryan and T. A. Seth, contra:*

The case is a plain one, we apprehend, for the schooner. We have had two decrees the same way on facts. We submit the case to this court, asking it to give us such interest by way of additional damages as may compensate us for the delay we have sustained by the numerous and, as we conceive, unjustified appeals of the other side.

Mr. Justice HUNT now, April 28th, 1873, delivered the opinion of the court.

The principles of law applicable to this case are well settled. They are not disputed by either party. In the case of *The Carroll*\* it is thus laid down: "Nautical rules require that where a steamship and sailing vessel are approaching each other from opposite directions, or on intersecting lines, the steamship, from the moment the sailing vessel is seen, shall watch with the highest diligence her course and movements, so as to be able to adopt such timely means of precaution as will necessarily prevent the two boats from coming in contact. Fault on the part of the sailing vessel at the moment preceding a collision does not absolve a steamer which has suffered herself and a sailing vessel to get in such dangerous proximity as to cause inevitable alarm and confusion, and collision as a consequence. The steamer, as having committed a far greater fault in allowing such proximity to be brought about, is chargeable with all the damages resulting from a collision."

The rule laid down in the case of *The Fannie*,† is still more applicable to the case before us. It was held that a schooner meeting a steamer approaching her on a parallel line, with the difference of half a point in the course of the two, ought to have kept on her course; that a steamer ap-

---

\* 8 Wallace, 302.　　　　　　† 11 Id. 238.

proaching a sailing vessel is bound to keep out of her way, and to allow her a free and unobstructed passage. Whatever is necessary for this it is her duty to do, and to avoid whatever obstructs or endangers the sailing vessel in her course. If, therefore, the sailing vessel does not change her course so as to embarrass the steamer, and render it difficult for her to avoid a collision, the steamer alone is answerable for the damage of a collision, if there is one.

·The schooner was sailing up the bay, on a course of north-by-west, with a very light breeze from the southeast. The steamer was sailing down the bay, with a course south-by-east-half-east, at about seven or eight miles an hour. When the steamer's men first saw the schooner the vessels were about two miles apart. The vessels, it will be observed, were on courses nearly parallel. The half-point of difference tended to a convergence.

Upon this state of facts the duty of the sailing vessel was to continue upon her course, leaving it to the steamer to avoid the collision. It was the plain duty of the steamer to accept this responsibility, and to assume that such would be the action of the schooner. The schooner was considerably to the eastward of the steamer, and it would seem that by simply bearing a half-point to the west, by which the convergence would be destroyed and perfectly parallel lines would result, that the steamer could have accomplished the safety of the passage. If there was any reason why this could not be done, which does not appear, a bearing to the east, by which the convergence would have been increased, would have carried the steamer in safety across the bows of the schooner. Neither course was adopted, but pursuing the middle course, so often the path of safety, but in this case most injudicious, of remaining on the course of south-by-east-half-east, the vessels came together.

The steamer seeks to avoid this difficulty by the allegation that the schooner changed her course, putting up her helm, that is, putting it to starboard, and thus throwing the schooner across the bows of the steamer. This view is sought to be sustained by the evidence that the captain

stated that he had put up his helm, and that the schooner was struck on her starboard bow by the port bow of the steamer. It is argued that this situation could have been produced in no other way.

We cannot believe that the schooner, bound northerly to Baltimore, with a breeze from the southeast, would have been sailing on a southwesterly course. This was quite out of her direction, and cannot be admitted, and yet it is the effect of the theory we are considering. Again, if such had been the course of the schooner it would have thrown her sails to the starboard, whereas it is proved that her sails were on the port side, and so remained until the actual collision, when they shifted to the starboard, doing some injury to the steamer. If the schooner put up her helm, it was in the moment of anxiety, and to avoid the danger of collision, which was then imminent. It is quite probable that seeing the steamer coming upon her, she put up her helm and sheered to the west, as the best means of escape. The steamer, at about the same moment, must have put her helm aport, and thus the port bow of the steamer and the starboard bow of the schooner were brought together. This is the natural explanation of the position, and is consistent with the evidence on the subject.

We are satisfied that no change was made in the course of the steamer until she was almost upon the schooner, as some of the witnesses express it, when she was within two minutes of the collision, as others say, when within thirty yards of the schooner, and that the collision was the result of her negligence.

There is no reason to suppose that the damages are excessive. The vessel had been purchased recently, and had been repaired after the purchase. The value of the vessel and of the cargo were sufficiently established, and the decree was within the amount proven.

The decree should be AFFIRMED WITH INTEREST from its date, March 12th, 1869, at the rate of interest allowed by the laws of Maryland.